UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ERIC ROMAN POWELL,

    Petitioner,

CASE NO. 05-71345
HONORABLE DENISE PAGE HOOD

v.

CAROL R. HOWES,

    Respondent.

_____/

**ORDER GRANTING PETITIONER'S MOTION FOR LEAVE TO AMEND PRO SE PETITION FOR A WRIT OF HABEAS CORPUS [DOCKET NO. 42], DENYING PETITIONER'S MOTION FOR RELEASE ON BOND CONDITIONS [DOCKET NO. 43] AND GRANTING PETITIONER'S MOTION TO STAY AND HOLD IN ABEYANCE [DOCKET NO. 45]**

**I.    INTRODUCTION**

This matter is before the Court on Petitioner's Motion for Leave to Amend Pro Se Petition for Habeas Corpus [**Docket No. 42, filed March 18, 2008**]**,** Petitioner's Motion for Release on Bond Conditions [**Docket No. 43, filed March 18, 2008**] and Petitioner's Motion to Stay and Hold in Abeyance [**Docket No. 45, filed May 21, 2008**]**.** Respondent has not filed a response to any of the motions.

The present action concerns a petition for habeas corpus. Petitioner, a state prisoner currently confined at the Lakeland Correctional Facility, was convicted of one count each of assault with intent to commit murder, MICH. COMP. LAWS § 750.83; armed robbery, MICH. COMP. LAWS § 750.529; and possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b, following a jury trial in Kent County Circuit Court. Petitioner filed a writ of habeas corpus on April 7, 2005. [**Docket No. 1**]**.**

## II. STATEMENT OF FACTS

The factual background underlying Petitioner's conviction was accurately summarized in petitioner's brief on appeal in the Michigan Court of Appeals:

> The prosecution said that Eric Powell shot Jonathan Bowman on the street as Mr. Bowman was in the process of selling drugs to Eric Powell and Nicholas Seals. Defendant Powell said that he was not involved in the shooting, and that Jonathan Bowman had made inconsistent statements concerning Mr. Powell's involvement.
>
> Nicholas Seals testified that he ran into his friend Eric Powell in the evening of March 23, 2000, and Powell asked where he could get some marijuana. They then saw Jonathan Bowman, from whom Mr. Seals had purchased marijuana in the past. They were in the process of buying a $20 bag of marijuana from Mr. Bowman when Powell pulled out a gun and directed Bowman to empty his pockets, which Bowman did (T III 6-10). Powell told Seals to take Bowman's coat and told Bowman to get into Bowman's car, which Bowman refused to do. Defendant Powell then fired his gun at Bowman. Bowman ran in one direction and Seals ran in another. As Seals was running, he heard two more shots (T III 18-19, 21). He said that he agreed to testify at this trial because of the plea bargain (T III 26).
>
> Jonathan Bowman testified that on the evening of March 23, 2000, he was in the neighborhood where he normally hung out and sold marijuana (T III 58). After Nicholas Seals called to him, Mr. Bowman walked over to where Mr. Seals and Defendant Powell were standing. He agreed to sell them some marijuana. Mr. Bowman testified that he laughed when he first saw a gun in Powell's hand because he knew Powell and they had never had problems with each other. After Powell directed Bowman to remove his coat, Bowman threw the coat to Seals at Powell's direction, but when Powell directed Bowman to get in his car Bowman refused and began to run. As he was running, he was shot in the back. He thought he heard five to six shots in all. He ran into a store where he gave the store owner $2,000 to hold for him (T III 59-61, 63, 66).
>
> Mr. Bowman said that he first told the police that he did not know who shot him. Then he looked at some photographs and picked out two other people, specifically telling the police that Eric Powell was not involved in the shooting (T III 87-88, 90). He testified that he did not cooperate with the police because he was planning his own retaliation against Mr. Powell and because he did not want to admit to the police that he sold dope (T III 100, 105). Charges involving drugs and carrying a concealed weapon were pending against him when he was shot, but Bowman testified that he made no deal for his testimony against Defendant Powell. However, he also testified that two to three weeks before this trial began, he entered into an agreement that would require him to spend only one year in the

county jail on the case or cases that had been pending against him at the time of the shooting (T III 81-83, 85). Mr. Bowman testified that he had four prior convictions for providing false information to the police and one for attempted receiving or concealing stolen property (T III 85).

The officer in charge of the case, Detective Erica Clark, confirmed, over a hearsay objection, that Jonathan Bowman initially stated that he did not know who shot him and that the was not interested in pursuing the matter. However, on April 10, 2000, Mr. Bowman appeared at the detective unit, said he had decided to cooperate, and provided the name of Eric Powell and Nicholas Seals (T III 135-136, 142-143).

On April 26, 2000, the police arrested Mr. Powell at his mother's home, where he was hiding in a bedroom closet (T III 125, 128).

Also on April 26, after Nicholas Seals had been arrested, Detective Clark spoke with Seals and told him, "You can help yourself - I can't help you much unless you tell us the truth." However, Detective Clark testified that she made no deals with Seals (T III 145-146). Seals admitted buying drugs from Bowman, but denied being involved in armed robbery (T III 151). The detective testified that Seals reported that after the shooting he found Jonathan Bowman's car keys on the sidewalk approximately fifteen to twenty feet away form his car (T II 87). Fingerprints were lifted from the car, but they did not belong to Defendant Powell (T III 110).

Def.'s Br. On App., in *People v. Powell*, No. 239310 (Mich. Ct. App.), at 1-3.

### III. MOTION TO AMEND PETITION

Petitioner moves to amend his habeas petition, pursuant to 28 U.S.C. §2254. On July 7, 2007 this Court appointed the Federal Defender Office to represent Mr. Powell in this litigation, and significant discovery regarding Petitioner's claims has been conducted, givnig rise to three substantial issues that have not been previously considered in this litigation:

(1) The same factors that resulted in the systematic exclusion of African-Americans from Kent County jury venires also excluded Hispanics. Mr. Powell's "fair cross-section," claim, while legally sufficient, fails to allege the full scope of the constitutional violation.

3

>   (2) The Kent County employee in charge of placing jurors from the jury pool into jury venires has testified that when selecting jurors for the venires in trials against African-American defendants, she regularly hand-selected from the few African-Americans present in the pool, to the exclusion of non-African-Americans (including Hispanics).
>
>   (3) Witness Jonothan Bowman's recantation not only raises concerns about actual innocence, but also gives rise to a potentially meritorious claim that the trial prosecutor in this case knowingly presented false testimony, allowed knowingly false testimony to go uncorrected during cross-examination, and failed to disclose exculpatory evidence.

*See* Mot. For Leave to Am. Writ at 2. Petitioner seeks to amend his petition to include a Sixth Amendment claim, an equal protection claim and a due process claim.

Under Federal Rule of Civil Procedure 11 this Court is given the discretion to incorporate the rules of civil procedure when appropriate. F. R. Civ. P. 11. In this case, Rule 15(a) provides for the amendment of the petition and Petitioner's Motion is GRANTED.

## IV. MOTION TO STAY AND HOLD IN ABEYANCE

Petitioner filed a Motion to Stay and Hold in Abeyance on May 21, 2008. **[Docket No. 45].** Respondent did not file a response. However, counsel for Respondent concurs that the stay-and-abeyance procedure is appropriate for this case.

When faced with a mixed petition for writ of habeas corpus, a district court has the authority to stay the petition and hold it in abeyance so that the petitioner may present his unexhausted claims to the state courts. *Rhines v. Weber*, 544 U.S. 269, 277 (2005). The district court abuses its discretion if it denies a stay and dismisses the mixed petition if the petitioner has "good cause" for his failure to exhaust. *Id.* at 278.

Here, Petitioner claims his failure to exhaust his Equal Protection Claim was due

to the fact that he was unaware of the facts giving rise to the claim. The first time the Kent County employee who was responsible for handpicking jurors was on June 16th, 2004, in a separate case. Petitioner claims there was no way for him to investigate or discover the facts, as a *pro se* litigant. The facts regarding Petitioner's Equal Protection Claim had not been fully developed until November 14, 2007, when the Kent County employee responsible for selecting jury venires fully explained the procedure that was used.

Petitioner's claim concerning the newly discovered evidence not available during prior court proceedings is sufficient to meet the "good cause" requirement. Petitioner has also demonstrated that his unexhausted claims are "potentially meritorious" as discussed prior. Finally, there is no indication that Petitioner has intentionally engaged in any form of dilatory litigation tactics based on the fact that the evidence regarding the Equal Protection claim was newly discovered, after his state court proceedings. Petitioner has shown that a stay would be appropriate under these circumstances, and his motion is GRANTED.

## V. MOTION FOR RELEASE ON BOND CONDITIONS

### 1. Legal Standard

Pursuant to the test used in *Marino v. Vasquez*, 812 F.2d 499, 507 (9th Cir. 1987), federal courts have authority to release a state prisoner on recognizance or surety in the course of a habeas corpus proceeding if the petitioner demonstrates: (1) that the petition presents a "substantial question" as to the constitutionality of the prisoner's detention; (2) "that a denial of bail could leave the petitioner without remedy" given how much time will

be expended in adjudicating his substantial claims or given other "extraordinary circumstances . . . that make the grant of bail necessary to make the habeas remedy effective"; and (3) that there is little risk that the petitioner will flee, given the surety or other conditions the court could impose. *Id.* at 771. The formula cannot be reduced to a set of rigid rules; it allows discretion to the district court. *Id.* at 770.

2. **Applicable Law & Analysis**

   a. **"Substantial Question" as to the Constitutionality of Mr. Powell's Detention**

The Petition for a Writ of Habeas Corpus identifies three issues that may raise a "substantial question" as to the constitutionality of his continued detention: (1) a Sixth Amendment claim; (2) an equal protection claim; and (3) a due process claim.

### i. Fair Cross-Section Claim

The Sixth Amendment provides that the jury venire must represent a "fair cross-section" of the community. U.S. Const. Amend. VI. A defendant has the right to a "jury drawn from venires representative of the community." *Apodaca v. Oregon*, 406 U.S. 404, 413 (1972). *See also United States v. Allen*, 160 F.3d 1096, 1103 (6th Cir. 1998). Petitioner's fair cross-section claim depends on the development of evidence about the way the jury venires were composed at the time of the petitioner's trial. *United States v. Grisham*, 63 F. 3d 1074, 1078 (11th Cir. 1995). To decide the matter, the court must "compare the difference between the percentage of the distinctive group among the population eligible for jury service and the percentage of the distinctive group" in the pool from which the jury was drawn. *Id.* African-Americans and Hispanics are 'distinctive' groups in the community. *See Peters v. Kiff*, 407 U.S. 493, 498 (1972); *See United States*

*v. Jackman*, 46 F.3d 1240, 1246 (2d Cir. 1995). It must be decided whether the statistics show that the representation of these groups in jury selection venires is "not fair and reasonable in relation to the number of such persons in the community". *Duren v. Missouri*, 439 U.S. 357, 364 (1979). Some courts have required a "ten percent minimum" of disparity between the percentage of the distinctive groups' population eligible for jury service and the percentage of the distinctive group in the pool from which the jury was drawn. *See*, *e.g.*, *Montgomery v. Bagley*, 482 F. Supp. 2d 919, 982 (N.D. Ohio 2007).

In this case Petitioner alleges that Kent County's jury selection system disproportionately selected jury venires from communities with relatively few minorities and disproportionately excluded potential jurors from areas with larger minority populations at the time of his trial. Petitioner claims that in a story that first appeared in the July 30, 2001, *Grand Rapids Press*, county officials admitted that their computer system had excluded "nearly 75 percent" of eligible residents from potential jury pools since 1991. (Doc. 1 at 24-25.) Petitioner further claims that the article also quoted the official as stating that "[m]any blacks were excluded from . . . jury pools due to a computer glitch that selected a majority of potential candidates from the suburbs." The Chief Judge of Kent County Circuit Court was quoted saying, "[t]here has been a mistake - a big mistake." *Id.* Petitioner has presented evidence that the African-American and Hispanic populations in Kent County combined constitute 13.37% of the overall jury-eligible population. (Ex. A at 9.) Petitioner's 45-person jury venire was 2.2% African-American and 0% Hispanic. Absolute disparity statistics show that African-Americans and Hispanics were under-represented on the jury venire by 11.17%. Comparative

7

disparity statistics show that African-Americans had a 73.3% reduced likelihood of appearing on the jury venire and Hispanics had a 100% reduced likelihood. African-Americans and Hispanics combined had an 83.54% reduced likelihood of appearing on the venire. *Id.*

The disparity calculations regarding Petitioner's jury venires are substantial and exceed the 10% requirement used in some jurisdictions. This reduction of distinctive groups selected for jury venires by 83.54% supports the allegation that the Kent County's jury selection system disproportionately selected jury venires and that the Petitioner has a compelling claim that there was not a fair cross-section of the community in his jury venire.

### ii. Equal Protection Claim

Petitioner's Equal Protection Claim is grounded in the Sixth Circuit's analysis in *United States v. Ovalle*, 136 F.3d 1092 (6th Cir. 1998). In *Ovalle*, the Sixth Circuit held that a 1992 Jury Selection Plan violated the equal protection component of the Fifth Amendment. *Id.* at 1109. It was decided that when "race is the predominant factor in excluding certain individuals from the jury wheel there must be a compelling governmental interest" and the actions taken must be "narrowly tailored to meet that interest." *Id.* at 1105. In *Ovalle*, the court found a compelling interest to secure fair cross-sections of the community in the jury pools, but the court also found that the Jury Selection Plan was not narrowly tailored. Non African-American jurors "did not have the same opportunity to serve as did the African-American members" and the Jury Selection Plan did not attempt to secure representation by Hispanic or any other group except for

8

African-Americans on the jury wheel. *Id.* at 1106.

In this case, Petitioner claims that the employee in charge of selecting jury venires in Kent County hand-selected African-Americans from jury pools when she noticed the pool was comprised of predominately whites. Petitioner claims that this was only done when the trial involved an African-American defendant. Petitioner claims that she did not hand-select members of the jury from other ethnic groups, only African-Americans.

The alleged actions of the Kent County employee, if accurate, show that race was a predominant factor in choosing jury venires and is analogous to the *Ovalle* case in that the jury selection system may not have been narrowly tailored to meet the government interest. Petitioner's claim is sufficient to support the allegation that the selection of his jury venire violated the Equal Protection Clause of the Fourteenth Amendment.

### iii. Due Process Claim

Petitioner also alleges a Due Process Claim under the Fourteenth Amendment based on *Giglio v. United States*, 405 U.S. 150 (1972), and *Napue v. Ill.*, 360 U.S. 264 (1959). In *Giglio*, the Court reversed the defendant's conviction and ordered a new trial because a prosecution witness testified falsely that he did not receive promises and that he would not be indicted. The prosecution in *Giglio* failed to correct the witness's false statement. *Napue*, 360 U.S. at 271. A new trial is required if the false testimony "in any reasonable likelihood" could have affected the judgement of the jury. *Giglio*, 405 U.S. at 154 (quoting *Napue*, 360 U.S. at 271).

In this case, Petitioner claims that the prosecution failed to correct false testimony made by Jonathan Bowman, a prosecution witness, when Bowman stated that his plea deal

9

"had nothing to do with" his testimony against Petitioner (Tr. III at 85). Bowman has recanted his trial testimony and claims that "because of" a plea deal he testified against Petitioner. (Doc. 1-3 at 12.) Petitioner claims that if the affidavit proves to be true, then the prosecution knowingly and intentionally elicited false testimony regarding a vital issue in Petitioner's case. Petitioner claims that Bowman's false testimony, the prosecution's failure to correct it, and the prosecution's affirmation of the testimony during closing arguments had a "reasonable likelihood" of affecting the judgment of the jury and violating the Fourteenth Amendment under *Napue*. *Napue*, 360 U.S. at 271.

Petitioner's allegations supported by Bowman's affidavit are sufficient to support his claim that the prosecution's false testimony violated the Fourteenth Amendment by creating a "reasonable likelihood" of affecting the jury's decision.

### b. Effective Remedy

The second part of the test to establish the right to release on recognizance or surety states that the petitioner must show: "that a denial of bail could leave the petitioner without remedy" given the amount of time that will be expended in adjudicating his substantial claims or given other "extraordinary circumstances . . . that make the grant of bail necessary to make the habeas remedy effective." *Marino*, 812 F.2d at 507.

In this case, the Petition is a "mixed petition" involving two claims that have not been exhausted in state court proceedings. The "total exhaustion rule" prevents a federal court from ruling on a case involving a mixed petition. *See Rose v. Lundy*, 455 U.S. 509, 520, 522 (1982). Petitioner claims he will be returning to state court in order to exhaust all constitutional claims, but that this process will be "futile" and "could take years."

Petitioner supports this claim by generally citing his past experience in the state court system, stating that the state court has been unwilling to consider the merits of his jury-related claims. While Petitioner expects to be involved in this litigation for years, the process cannot be said to be futile because Petitioner still faces substantial time remaining on his sentence. Due to the lengthy remaining duration of Petitioner's sentence, once Petitioner exhausts his claims in state court, he will still have the opportunity to receive an effective remedy in this Court.

        c.     **Risk That Petitioner Will Flee**

The third part of the test to establish the right to release on recognizance or surety states that the petitioner must show "that there is little risk that the petitioner will flee, given the surety or other conditions the court could impose." *Marino*, 812 F.2d at 507.

On January 12, 2001, before his first trial in Kent County Circuit Court, Petitioner was granted bond and posted the bond for his release on January 26, 2001. On August 13, 2001, Petitioner's co-defendant pled guilty. On that day, Petitioner's bond amount was increased to $100,000 and Petitioner was unable to post bond or surety in that amount. He filed a Motion to Reduce Bond on August 20, 2001, which was denied on August 24, 2001. (Ex. A at 3.)

Petitioner claims that he had an excellent record while on supervision before his state court trial and that the increase in bond was based solely on his co-defendant's guilty plea. Petitioner claims that the increase in bond had nothing to do with his own conduct, and cites his record under supervision in the present case as evidence that there is little risk that Petitioner will flee.

Plaintiff has been convicted of one count each of assault with intent to commit murder, armed robbery, and possession of a firearm during the commission of a felony, and was sentenced for a period of 16 and a half to 75 years in prison on the assault and robbery offenses, and two years on the firearms offense. While Petitioner very well may have has an excellent record under supervision in this case, it was prior to the lengthy sentence being imposed on him. Despite Petitioner's assertions, this Court does not find that there "is little risk that the petitioner will flee." *See Marino.*

V. **CONCLUSION**

Accordingly,

IT IS ORDERED that Petitioner's Motion for Leave to Amend Pro Se Petition for Habeas Corpus [**Docket No. 42, filed March 18, 2008**] is GRANTED.

IT IS FURTHER ORDERED Petitioner's Motion for Release on Bond Conditions **[Docket No. 43, filed March 18, 2008]** is DENIED.

IT IS FURTHER ORDERED that Petitioner's Motion to Stay and Hold in Abeyance **[Docket No. 45, filed May 21, 2008]** is GRANTED.

12

IT IS FURTHER ORDERED that this matter is ADMINISTRATIVELY CLOSED. Upon exhaustion of claims in state court Petitioner may refile petition with this Court.

S/Denise Page Hood
Denise Page Hood
United States District Judge

Dated: September 22, 2008

I hereby certify that a copy of the foregoing document was served upon counsel of record on September 22, 2008, by electronic and/or ordinary mail.

S/William F. Lewis
Case Manager