UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ERIC ROMAN POWELL,

    Petitioner,

v.

CAROL R. HOWES,

    Respondent.
_____/

CASE NO. 2:05-CV-71345
JUDGE DENISE PAGE HOOD
MAGISTRATE JUDGE PAUL J. KOMIVES

# REPORT AND RECOMMENDATION

I.    RECOMMENDATION: The Court should grant petitioner's application for the writ of habeas corpus.

II.    REPORT:

A.    *Procedural History*

1.    Petitioner Eric Roman Powell is a state prisoner, currently confined at the St. Louis Correctional Facility in St. Louis, Michigan.

2.    On November 9, 2001, petitioner was convicted of one count each of assault with intent to commit murder, MICH. COMP. LAWS § 750.83; armed robbery, MICH. COMP. LAWS § 750.529; and possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b, following a jury trial in the Kent County Circuit Court. On December 17, 2001, he was sentenced as a third habitual offender, MICH. COMP. LAWS § 769.11, to concurrent terms of 16½-75 years' imprisonment on the assault and robbery convictions, and to a mandatory consecutive term of two years' imprisonment on the felony firearm conviction.

3. Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

> I. THE PROSECUTION COMMITTED REVERSIBLE ERROR WHEN SHE ARGUED TO THE JURY IN CLOSING THAT IF THE JURY FAILED TO CONVICT DEFENDANT THE "LAW OF THE STREETS" WOULD "WIN."
>
> II. WHEN KENT COUNTY HAS ACKNOWLEDGED PUBLICLY THAT BECAUSE OF AN ERROR IN ITS COMPUTER SYSTEM, NEARLY SEVENTY-FIVE PERCENT OF THE COUNTY'S ELIGIBLE JURORS WERE BEING EXCLUDED FROM JURY POOLS DURING THE TIME WHEN JURORS WERE SELECTED IN THIS CASE, AND THEY WERE BEING EXCLUDED IN A MANNER THAT RESULTED IN AN UNDERREPRESENTATION OF AFRICAN-AMERICANS, DEFENDANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO A JURY DRAWN FROM A VENIRE REPRESENTATIVE OF A FAIR CROSS-SELECTION OF THE COMMUNITY.
>
> III. WHEN DEFENDANT MADE AN OFFER OF PROOF THAT THE COMPLAINANT RECANTED HIS IDENTIFICATION TESTIMONY, DEFENDANT IS ENTITLED TO A REMAND TO ESTABLISH THAT RECANTATION ON THE RECORD AND MOVE FOR A NEW TRIAL.
>
> IV. THE TRIAL COURT ABUSED ITS DISCRETION WHEN, OVER DEFENSE OBJECTION, IT PERMITTED A POLICE OFFICER TO GIVE HIGHLY INFLAMMATORY [sic] HEARSAY TESTIMONY.
>
> V. THE TRIAL COURT ABUSED ITS DISCRETION WHEN, OVER DEFENSE OBJECTION, IT PERMITTED A POLICE OFFICER TO GIVE HEARSAY TESTIMONY THAT THE COMPLAINANT SAID HE DID NOT WANT TO PURSUE THE CASE OR TESTIFY AT TRIAL WHEN SUCH TESTIMONY UNFAIRLY PREJUDICED DEFENDANT.

The court of appeals found no merit to petitioner's claims, and affirmed his conviction and sentence. *See People v. Powell*, No. 239310, 2003 WL 22976107 (Mich. Ct. App. December 18, 2003) (per curiam).

4. Petitioner, proceeding *pro se*, sought leave to appeal these issues to the Michigan Supreme Court. Petitioner also raised two additional claims: (1) denial of his right to testify in

his own defense, and ineffective assistance of counsel in connection with the decision not to testify; and (2) denial of a fair trial based on the cumulative effect of the errors at his trial. The Supreme Court denied petitioner's application for leave to appeal in a standard order. *See People v. Powell*, 471 Mich. 865, 683 N.W.2d 675 (2004). The Supreme Court subsequently denied petitioner's motion for reconsideration. *See People v. Powell*, 471 Mich. 922, 688 N.W.2d 830 (2004).

5. Petitioner, proceeding *pro se*, filed an application for a writ of habeas corpus on April 7, 2005. As grounds for the writ of habeas corpus, he raises the five claims that he raised in the Michigan Court of Appeals.

6. Respondent filed her answer on October 12, 2005. She contends that petitioner's first two claims are barred by petitioner's procedural default in the state courts, and that his remaining claims are not cognizable on habeas review.

7. Petitioner filed a reply to respondent's answer on November 21, 2005.

8. On May 1, 2007, the Court, adopting my Report and Recommendation, denied each of petitioner's claims except for his claim that he was denied his Sixth Amendment right to a jury drawn from a fair cross-section of the community. The Court ordered an evidentiary hearing with respect to that claim, finding that the record lacked the evidence necessary to determine whether African Americans were systematically excluded by Kent County's computer error.

9. Petitioner, through counsel, moved to amend his habeas petition and moved for a stay of proceedings to exhaust new constitutional claims allegedly developed in preparation for the evidentiary hearing. The Court granted petitioner's motion to stay proceedings on September 22, 2008.

10. Petitioner filed a motion for relief from judgment in the trial court pursuant to MICH. CT.

R. 6.500-.508, raising the following claim:

> I. IN AN APPARENT EFFORT TO ADDRESS THE OBVIOUS UNDER REPRESENTATION OF MINORITIES IN KENT COUNTY JURY VENIRES, JURY DEPARTMENT PERSONNEL ENGAGED IN PURPOSEFUL RACIAL DISCRIMINATION IN THE SELECTION OF JURORS, THEREBY VIOLATING PETITIONER'S RIGHTS UNDER THE EQUAL PROTECTION CLAUSE.

In August 2009, the trial court denied petitioner's motion for relief from judgment. The Michigan Court of Appeals and Michigan Supreme Court denied petitioner's applications for leave to appeal in standard orders, based on petitioner's "failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Powell*, 486 Mich. 927, 781 N.W.2d 848 (2010); *People v. Powell*, No. 290916 (Mich. Ct. App. October 2, 2009).

11. On November 9, 2010, I entered an Order granting petitioner's motion to reopen habeas corpus proceedings.

12. Petitioner, though counsel, filed a supplemental brief in support of petition for a writ of habeas corpus on October 25, 2010. As grounds for the writ of habeas corpus, he raises two claims.

> I. WHEN KENT COUNTY HAS ACKNOWLEDGED PUBLICLY THAT BECAUSE OF AN ERROR IN ITS COMPUTER SYSTEM, NEARLY SEVENTY-FIVE PERCENT OF THE COUNTY'S ELIGIBLE JURORS WERE BEING EXCLUDED FROM JURY POOLS DURING THE TIME WHEN JURORS WERE SELECTED IN THIS CASE, AND THEY WERE BEING EXCLUDED IN A MANNER THAT RESULTED IN AN UNDERREPRESENTATION OF AFRICAN-AMERICANS, DEFENDANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO A JURY DRAWN FROM A VENIRE REPRESENTATIVE OF A FAIR CROSS-SELECTION OF THE COMMUNITY.
>
> II. IN AN APPARENT EFFORT TO ADDRESS THE OBVIOUS UNDER REPRESENTATION OF MINORITIES IN KENT COUNTY JURY VENIRES, JURY DEPARTMENT PERSONNEL ENGAGED IN PURPOSEFUL RACIAL DISCRIMINATION IN THE SELECTION OF JURORS, THEREBY VIOLATING PETITIONERS RIGHTS UNDER THE EQUAL PROTECTION CLAUSE.

13.     Respondent filed her supplemental answer on December 17, 2010. She contends that petitioner's second claim is barred by petitioner's procedural default in the state courts, and that his remaining claim is not cognizable on habeas review.

14.     Petitioner filed a reply to respondent's answer on January 7, 2011.

B.     *Factual Background Underlying Petitioner's Conviction*

Petitioner went to trial in Kent County Circuit Court on November 5, 2001.[1] Around that time, employees of Kent County's jury department and other observers were beginning to notice a relative lack of minorities in the jury pool.

In July of 2002, after conducting its own internal investigation, the Kent County Circuit Court acknowledged that the geographic distribution of the jury pool did not represent that of the county. The cause of the problem, the court's internal investigation determined, was a "computer glitch." Evidentiary Hrg. Tr., dated 10/26/09, at 29.[2]

In a story first reported in the Grand Rapids Press on July 30, 2002, Kent County Chief Circuit Judge George Buth was quoted saying, "There has been a mistake – a big mistake." *Kent admits computer glitch in jury selection*, Grand Rapids Press, July 30, 2002, at A1, R. 1, at 33-35. Specifically, the article explains, "Many blacks were excluded from Kent County jury pools due to a computer glitch that selected a majority of potential candidates from the suburbs …." *Id.*

In a Report of its findings, the Kent County Information Technology Department explained the nature of the "computer glitch." Kent County Report, R., 42-6 at 27-30.

---

[1] The factual background underlying petitioner's conviction was accurately summarized in my initial Report and Recommendation, which was adopted by this Court on May 1, 2007.

[2] On October 26, 2009, Magistrate Judge Binder conducted an evidentiary hearing in *Parks v. Warren*, No. 05-10036, and *Ambrose v. Booker*, No. 06-13361, two cases involving substantially the same jury selection issue present here. Petitioner relies on the testimony developed at this evidentiary hearing in support of his claim.

Prospective jurors are identified through a list, known as a "State File," which is generated by the Michigan Secretary of State's Office based on driver's licenses and state-issued identification cards. *Id.* at 29-30. The Report explains,

> Prior to April 2001, the updating and loading of the State File into the database of the Jury Management System was performed, for a fee, by ACS [a private vendor]. The ACS system delivered utilizes a Sybase database ….
> Beginning in 2001, Kent County Information Technology (KCIT) began a project, using County IT staff, to move this entire process of updating and loading the State File into an Oracle database. The reasons behind this move were … cost cutting … and … timeliness. The County database standard is Oracle, which explains the rationale of moving Sybase to Oracle. In addition KCIT has Oracle experience on-staff, but did not have expertise with Sybase.
> It has been determined that in the initial set-up of the Oracle database to accommodate the driver's license and State ID data from the State File, [an] error was in one parameter. Whether this was a programming error, the carry-over of a setting that existed within the Sybase database, misinterpreting instructions, or simply human error, this is almost impossible to determine. The parameter that was entered within the database was 118,169. What should have been inserted within this setting was the total number of records in the State File, or 453,981 in 2001.
> The net effect of this incorrect parameter is that the Jury Management System performed a random selection against the first 118,169 prospective jurors on the file. The percentage of jurors selected per Zip Code was proportional to the Zip Code composition of the first 118,169 records – but not Kent County as a whole.

*Id.* at 29.

The Report also explains how this computer glitch resulted in the vast overrepresentation of some zip codes and a vast underrepresentation of other zip codes:

> [I]n 1998 … the State File did not come in random order, but rather in Zip Code order [from the] lowest numbers to highest numbers. In subsequent years, new prospective jurors … were added to the end of the dataset. Existing prospective jurors … would simply have address information updated based on what the State provided. Their position in the dataset would not change. Therefore, the first 118,169 records of the dataset have a high percentage of the lower numbered zip codes.… [A]ll the Zip Codes with the lower numbers are located outside of the Grand Rapids metro area.

*Id.* at 30. What Kent County's report did not say, but what was apparent to anybody

6

paying attention (and has now been conclusively proven and acknowledged), is that Kent County's minority population is concentrated in the urban areas within higher-numbered Zip codes. The County's suburban areas within the lower-numbered zip codes, however, are home to very few minorities.

A July 31, 2002 article in the Grand Rapids Press draws this conclusion after summarizing Kent County's findings:

> The Kent County Jury Management Report … said the problem stems from a glitch in April 2001….
> Although 453,981 names and addresses of eligible jurors from Kent County were on the list provided by Michigan's Secretary of State from driver's license rolls, the computer got instructions to consider only 118,169 names.
> After proportionately selecting from all ZIP codes, the computer routinely still needed more jurors. The additional names then were automatically taken from the same abbreviated list, starting at the lowest numbered ZIP codes – which are in the suburbs. The second search process almost never went further than 49505 – leaving out areas where most of the country's minority population lives: Grand Rapids, Kentwood, Wyoming and Walker.

*Fallout from jury foul-up: appeals, delays*, Grand Rapids Press, July 31, 2002, at A1, R.1 at 36-37. Both parties have acknowledged that the existence of a computer glitch is "irrefutable," and have acknowledged that "during this window of time there was a systematic error in the people that were put into the … jury venire." Evid. Hrg. Tr., dated 10/26/09, at 11.

Gail VanTimmeren is an employee of Kent County Circuit Court's Jury Department with the responsibility of selecting, from a larger jury pool, 45-person jury venires to report to the various trials in Kent County Circuit Court. VanTimmeren Dep., dated 11/14/07, R. 42-4 at 5. Ms. VanTimmeran testified that she became acutely aware of the significant underrepresentation of minorities in Kent County's jury pools. *Id.* at 15-16. On a number of occasions, Ms. VanTimmeran hand selected minorities on a visual basis of ethnicity, in order to correct the underrepresentation of minorities. Specifically, she did so in cases with ethnic defendants (i.e. if

7

there was a black defendant, and there were very few black jurors to choose from, she would place those black jurors into that veneer). *Id.* at 19-20.

Dr. Lyke Thompson, Ph.D., the Director of the Center for Urban Studies at Wayne State University, and Mr. Douglas Towns, the Program Manager for the Michigan Metropolitan Information Center at the Center for Urban Studies, provided expert statistical and demographic services in their December, 2007 report entitled "A Demographic Report of Kent County's Minority Population and its relation to Jury Pool Selection." R. 42-3. These experts concluded that in Kent County, African-Americans make up 7.95% of the jury-eligible population (individuals aged 18-and-over), Hispanics / Latinos make up 5.42% of the jury-eligible population, and these populations combined constitute 13.37% of the overall jury-eligible population. Based on geographic analysis of census data, Dr. Thompson and Mr. Towns also concluded that these two minority groups tend to live in the same zip codes. Thus, the systematic exclusion of certain zip codes from Kent County's jury pools and venires not only resulted in the under representation of African-Americans, but also heavily impacted the Hispanic / Latino population.

It is uncontested that petitioner's jury venire consisted of only one African-American juror and no Hispanic or Latino jurors. R. 1 at 31; R. 42-10. In other words, the jury venire was 2.2% African-American, 0% Hispanic/Latino, and 2.2% African-American or Hispanic/Latino. Additionally, in questionnaires distributed to petitioner's specific jury pool – the 377 individuals summoned during the month of petitioner's trial – only 3.38% of respondents identified themselves as African-American, 1.57% identified themselves as Hispanic/Latino, and 4.95% considered themselves either Africa-American or Hispanic/Latino. R. 42-3 at 8. With these figures applied to the absolute disparity test and the comparative disparity tests, the following

8

statistics were computed:

Jury Pool Disparities

|  | Absolute | Comparative |
|---|---|---|
| Black: | 4.57 | 57.48 |
| Hispanic: | 4.29 | 79.17 |
| Black or Hispanic: | 8.86 | 66.28 |

Jury Venire Disparities

|  | Absolute | Comparative |
|---|---|---|
| Black: | 5.75 | 72.32 |
| Hispanic: | 5.42 | 100.00 |
| Black or Hispanic: | 11.17 | 83.54 |

C.  *Procedural Default*

Respondent first contends that petitioner's claims are barred by petitioner's procedural default in the state courts. The Court should disagree.

Under the procedural default doctrine, a federal habeas court will not review a question of federal law if the state court's decision rests on a substantive or procedural state law ground that is independent of the federal question and is adequate to support the judgment. See *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). However, "a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on the procedural bar." *Harris*, 489 U.S. at 263. Furthermore, "only a 'firmly established and regularly followed state practice' may be interposed by a State to prevent subsequent review … of a federal constitutional claim." *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991) (quoting *James v. Kentucky*, 466 U.S. 341, 348-51 (1984)); see also, *Calderon v. United States Dist. Ct. for the E. Dist. of Cal.*, 96 F.3d 1126, 1129 (9th Cir. 1996) (internal quotation omitted) ("For the procedural default doctrine to apply, a state rule must be clear, consistently applied, and well-established at the time of the petitioner's purported default.").

9

Here, there is no question that the state courts relied on an adequate and independent state procedural rule to bar petitioner's claim. Nevertheless, petitioner can still obtain habeas review of his claim if he can establish "cause" for his default-that is, if he can "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *see also, Coleman*, 501 U.S. at 753. Cause may be established by " 'a showing that the factual or legal basis for a claim was not reasonably available to counsel, or that some interference by officials made compliance impracticable, would constitute cause[.]' " *Amadeo v. Zant*, 486 U.S. 214, 222 (1988) (quoting *Murray*, 477 U.S. at 488 (internal quotation omitted)).

Here, the interference by the jury department personnel when impaneling the jury made petitioner's and his counsel's compliance impracticable. This is not a case where a publicly available jury selection plan itself systematically excluded minorities such that counsel could have known about that problem in advance of trial. Rather, the alleged systematic exclusion here resulted from the unknown actions of a jury department employee who hand-selected jurors for the jury venire in an attempt to correct the underrepresentation of minorities which was the result of an unknown computer glitch. It is undisputed that the jury department employee's actions which allegedly resulted in systematic exclusion were unknown at the time of trial. Nor is there any indication that counsel should have been on notice of the error such that he should have challenged the composition of the jury venire sooner. The composition of petitioner's venire alone should not have spurred counsel to lodge an objection, because it is clear that this fact alone would be insufficient to support a fair cross-section claim. It is well established that "[e]vidence of a discrepancy on a single venire panel cannot demonstrate systematic exclusion." *United States v. Horne*, 4 F.3d 579, 588 (8th Cir. 1993); accord *United States v. Williams*, 264

10

F.3d 561, 568 (5th Cir. 2001); *United States v. Hill*, 197 F.3d 436, 445 (10th Cir. 1999); *United States v. DeFries*, 129 F.3d 1293, 1301 (D.C. Cir. 1997).

In short, until the jury department employee's actions were publicly disclosed well after petitioner's trial, neither petitioner nor his counsel had any reason to suspect that the equal protection requirement had been violated, nor any reason to conduct an investigation into Kent County's jury selection practices. This is sufficient to establish cause to overcome petitioner's procedural default in failing to object at trial and in failing to raise the claim on direct appeal. Accordingly, the Court should reject respondent's procedural default defense.

D.      *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996). *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

By its terms, however, § 2254(d) imposes an additional bar to relief for claims that were "adjudicated on the merits in State court proceedings." *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011) (noting that under 28 U.S.C. § 2254(a) habeas relief is generally available

11

where a person is incarcerated in violation of the Constitution, but where the "application includes a claim that has been 'adjudicated on the merits in State court proceedings'" the "additional restriction" of § 2254(d) "applies."). Thus, "[t]o the extent that the state court did not assess the merits of a claim properly raised in the habeas petition, . . . AEDPA deference does not apply and we review questions of law and mixed questions of law and fact *de novo*." *McElrath v. Simpson*, 595 F.3d 624, 630 (6th Cir. 2010); *see also*, *Newton v. Million*, 349 F.3d 873 (6th Cir. 2003). Here, the state courts have never addressed petitioner's fair cross section claim on the merits, instead finding it waived or procedurally defaulted. Thus, § 2554(d) is inapplicable, and the only question is whether, on *de novo* review, petitioner was denied his constitutional right to a jury drawn from a fair-cross section of the community.

E.     *Fair Cross-Section Claim (Ground 1)*

   1.     *Governing Law*

The Sixth Amendment guarantees a criminal defendant the right to be tried before a jury drawn from a fair cross-section of the community. *See Duren v. Missouri*, 439 U.S. 357, 359 (1979); *Taylor v. Louisiana*, 419 U.S. 522, 526-31 (1975).

> In order to establish a prima facie violation of the fair cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process.

*Duren*, 439 U.S. at 364.

Moreover, the absence of evidence that this exclusion was the intentional result of racial animus is irrelevant to a fair cross-selection claim. "In a fair cross-selection analysis, purposeful discrimination is irrelevant since the emphasis is purely on the structure of the jury venire." *United States v. Perez-Hernandez*, 672 F.2d 1380, 1384 n.5 (11th Cir. 1982). Thus,

12

"disproportionate exclusion of a distinctive group from the venire need not be intentional to be unconstitutional, but it must be systematic." *Randolph v. California*, 380 F.3d 1133, 1141 (9th Cir. 2004); *see also*, *Duren*, 439 U.S. at 368 n.26; *United States v. Weaver*, 267 F.3d 231, 244 (3d Cir. 2001); *United Stated v. Jackman*, 46 F.3d 1240, 1246 (2d Cir. 1995).

If a petitioner establishes a prima facie case, the burden shifts to the state to show that "a significant state interest [is] manifestly and primarily advanced by those aspects of the jury-selection process … that result in the disproportionate exclusion of a distinctive group." *Duren*, 439 U.S. at 367-68.  *See also Taylor*, 419 U.S. at 534 ("The right to a proper jury cannot be overcome on merely rational grounds.").

*2.     Analysis*

Petitioner contends that the jury pool did not represent a fair cross-section of the community due to the underrepresentation of African-Americans and Hispanics.  The Court should conclude that petitioner is entitled to habeas relief on this claim.

As to the first prong of the *Duren* analysis, the Supreme Court has recognized African-Americans as a "'distinctive' group in the community."  *See Peters v. Kiff*, 407 U.S. 493, 498 (1972) ("The exclusion of Negroes from jury service, like the arbitrary exclusion of any other well-defined class of citizens, offends a number of related constitutional values."); *Ramseur v. Beyer*, 983 F.2d 1215, 1230 (3d Cir. 1992) ("African-Americans are unquestionably a constitutionally cognizable group.").  Hispanics are recognized as such as well.  *See United States v. Jackman*, 46 F.3d 1240, 1246 (2d Cir. 1995) ("[T]here is little question that both Blacks and Hispanics are 'distinctive' groups in the community for purposes of this test.") (citations omitted).  The groups excluded from jury service were African-American and Hispanic.  Thus, the groups alleged to be excluded are "distinctive" groups in the community.  Therefore, the first

13

prong of the *Duren* analysis has been met.

As to the second prong of the *Duren* analysis, the Supreme Court has not adopted a specific test to measure underrepresentation. *See Berghuis v. Smith*, 130 S.Ct. 1382, 1393-94 ("[W]e would have no cause to take sides today on the method or methods by which underrepresentation is appropriately measured."). Therefore, a case-by-case approach is reasonable. *See People v. Smith*, 463 Mich. 199, 204, 615 N.W.2d 1, 3 (2000) ("Provided that the parties proffer sufficient evidence … the results of all tests [should be considered]."). The evidence presented in this case was applied to the two most common methods of analysis in fair-cross section claims, the absolute disparity test and the comparative disparity test.

The absolute disparity test measures the difference between the percentage of the distinctive group in the population eligible for jury duty and the percentage of that group who actually appear in the venire. *People v. Bryant*, 289 Mich. App. 260, 268, 796 N.W.2d 135, 140 (Mich. Ct. App. 2010), *leave to appeal granted*, 489 Mich. 924, 797 N.W.2d 135 (2011) (citing *Ramseur v. Beyer*, 983 F.2d 1215, 1231 (3rd Cir. 1992)). In this case, the absolute disparity rates for the jury pool were as follows: Blacks 4.57%, Hispanics 4.29%, Black or Hispanic 8.86%. Further, the absolute disparities for the jury venire were: Blacks 5.75%, Hispanics 5.42%, Black or Hispanic 11.17%. Moreover, the total exclusion of African-Americans and Hispanics from jury venire would have resulted in no more than 13.37 percent disparity. Therefore, even a total exclusion of African-Americans and Hispanics from the jury pool would not allow a Sixth Amendment fair cross-section claim to be successful because the total percentage of minority votes in the Kent County population constitutes a percentage that is less than that which is considered statistically significant for Sixth Amendment fair cross-section purposes. *See Bryant*, 289 Mich. App. at 268-69, 796 N.W.2d at 140-41 ("[T]he absolute disparity test is an ineffective

14

measure of acceptable disparity because of the low percentage of African-Americans who were eligible to vote in Kent County.") (citations omitted); *Hubbard*, 552 N.W.2d. 493, 502 (Mich. App. 1996). Thus, reliance on the absolute disparity test is an unreasonable application of law.

The comparative disparity test "measures the diminished likelihood that members of an underrepresented group, when compared to the population as a whole, will be called for jury service." *Bryant*, 289 Mich. App. at 269, 796 N.W.2d at 141 (quoting *Ramseur*, 983 F.2d at 1231-32). In this case, the comparative disparity rates for the jury pool were as follows: African-Americans 57.48%, Hispanics 79.17%, African-American or Hispanic 66.29%. Further, the comparative disparities for the jury venire were: African-Americans 72.32%, Hispanics 100.00%, African-Americans or Hispanic 83.54%. The comparative disparity in this case for the jury venire, 72.32 percent, is sufficient to demonstrate an unfair and unreasonable representation of minorities in a jury venire. *See Bryant*, 289 Mich. App. at 269, 796 N.W.2d at 141 ("[S]eventy-three and one tenth percent is a significant comparative disparity and is sufficient to demonstrate that the representation of African-Americans in the venire for defendant's trial was unfair and unreasonable."); *see also United States v. Rogers*, 73 F.3d 774, 777 (8th Cir. 1996) (holding that comparative disparity of more than 30 percent satisfies the second prong of *Duren*.). Thus, petitioner has established that African-Americans were underrepresented on the venire from which the jury was selected. Therefore, the second prong of the *Duren* analysis has been met.

As to the third prong of the *Duren* analysis, systematic exclusion means exclusion that is "inherent in the particular jury-selection process utilized." *Duren*, 439 U.S. at 366. The error in the jury selection process utilized in Kent County occurred from a computer glitch. First, the Secretary of State provided Kent County with a list of 453,414 individuals who were eligible to

vote in Kent County, but the Information Technology department for the Kent County Circuit Court erroneously reduced this list to only 118,000 individuals. Second, the computer program used in Kent County did not select jurors at random across all zip codes, as it was supposed to do. As a result of the problem with the computer program, jurors were overselected from areas with lower number zip codes (which contained small minority populations) and underselected from areas with higher number zip codes (which contained large minority populations). Thus, the computer glitch led to a geographic exclusion, which resulted in a minority exclusion. Therefore, under-representation of minorities was inherent in the jury selection process utilized in Kent County at the time the computer glitch existed. *See Bryant*, 289 Mich. App. at 274, 796 N.W.2d 143 (holding that there the underrepresentation of African-Americans in Kent County jury venires was the result of the system by which jurors were selected by zip code, and because of the problem with the computer program, underrepresentation was inherent in the jury-selection process.). Moreover, "systematic exclusion" can be shown by a large discrepancy repeated over time such that the system must be said to bring about the underrepresentation. *Duren*, 439 U.S. at 366. In this case, the computer glitch causing an underrepresentation of minorities in the jury pools persisted over a period of sixteen months, making this process systemic. *See Duren*, 439 U.S. at 366 (concluding that underrepresentation of women in every weekly venire for nearly a year constituted underrepresentation that was systemic.). Therefore, the exclusion of minorities from the jury venire was "systematic." Thus, the third prong of the *Duren* analysis has been met, and petitioner has established a prima facie violation of the Sixth Amendment's fair cross-section requirement.

   Thus, the Court should conclude that petitioner has satisfied his burden of establishing the three prima facie elements of his fair cross-section claim. *See Ambrose v. Booker*, 781 F.

Supp. 2d 532, 543-45 (E.D. Mich. 2011) (Ludington, J.) (reaching same conclusion on similar facts with respect to Kent County jury system).[3] The burden therefore shifts to the respondent to show that "a significant state interest [is] manifestly and primarily advanced by those aspects of the jury-selection process … that result in the disproportionate exclusion of a distinctive group." *Duren*, 439 U.S. at 367-68. Respondent has not provided any argument to that effect. Thus, petitioner is entitled to a new trial. Accordingly, the Court should conclude that petitioner is entitled to habeas relief on this claim.[4]

F.   *Conclusion*

In view of the foregoing, the Court should conclude that petitioner did not procedurally default his fair cross-section claim, and that petitioner was denied his Sixth Amendment right to a jury drawn from a fair cross-section of the community. Accordingly, the Court should grant petitioner's application for the writ of habeas corpus.

III.   NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in Fed. R. Civ. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with

---

[3] The Court's decision in *Parks v. Warren*, 773 F. Supp. 2d 715 (E.D. Mich. 2011) (Lawson, J.), is not to the contrary. In that case, the Court found no violation of the fair cross-section requirement, but only because in that case "the racial composition of the petitioner's jury venire reflected almost exactly the proportion of minorities in the community." *Id.* at 726. Here, on the contrary, there was a significant disparity between the racial composition of petitioner's jury venire and the racial composition of Kent County.

[4] The Court need not address petitioner's equal protection claim, in light of the fact that relief of the second claim would be a new trial, which has already been recommended as relief to the first claim.

specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991), *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/Paul J. Komives  
PAUL J. KOMIVES  
UNITED STATES MAGISTRATE JUDGE

Dated: 11/22/11

The undersigned certifies that a copy of the foregoing order was served on the attorneys of record and by electronic means or U.S. Mail on November 22, 2011.

s/Eddrey Butts  
Case Manager